No. 95-420

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

STATE OF MONTANA,

       Plaintiff and Respondent,

  v.

CORY SCOTT WALSH,

       Defendant and Appellant.

FILED

JAN 10 1997

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District court of the Twenty-First Judicial
               District, in and for the County of Ravalli
               Honorable Jeffrey H. Langton, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

      David E. Stenerson, Hamilton, Montana

      For Respondent:

        Honorable Joseph P. Mazurek, Attorney General;
        Pamela P. Collins, Assistant Attorney General,
        Helena, Montana

        George Corn, County Attorney, Hamilton, Montana

Submitted on Briefs:  October 10, 1996

Decided:  January 10, 1997

Filed:

Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

Cory Scott Walsh appeals his criminal convictions in the District Court for the Twenty-First Judicial District, Ravalli county. A jury found Walsh guilty of aggravated assault, accountability for aggravated assault, accountability for misdemeanor assault and assault. We affirm.

The issues on appeal are whether sufficient evidence supports the jury's findings and whether prosecutorial misconduct was established in the State's amendments to the information.

Because the sufficiency of the evidence is at issue, we set forth the facts in the light most favorable to the prosecution.

On May 11, 1994, Melodie Stewart, her ten-year-old daughter Chellsi, and her fiance Christopher Lecce went to Lake Como, near Hamilton, Montana, for a picnic. They left the lake at dusk in Stewart's Chevrolet pickup truck, with Lecce at the wheel.

A car came up behind the pickup on the highway and began following it closely with its bright lights on. Lecce flipped his rear-view mirror down so that the bright lights would not be in his eyes, and slowed down to let the car pass. The car continued to tailgate the pickup with its bright lights on for a little over two miles. When the car finally passed them, Lecce flicked his bright lights on and off.

The two persons in the car, Cory Walsh and Christopher Driscoll, made obscene gestures out of the car windows. They then stopped the car directly in front of the pickup. They jumped out,

2

leaving their car doors open and blocking the roadway. Appearing very upset, they approached the pickup.

Lecce got out of the pickup and the three men began to argue. Walsh was very close to Lecce, and Lecce pushed him away. Stewart, still in the car with Chellsi, screamed at them to stop. Walsh said, "Shut up, bitch." Lecce turned to look at Driscoll, who was behind him. Walsh then hit Lecce so hard that it brought him to his knees. When Lecce got up, Walsh hit him again. Lecce tried to get up, but both Walsh and Driscoll were hitting him, preventing him from getting to his feet.

Stewart locked the doors to the pickup and told Chellsi to lie down out of sight. Lecce was on the ground and Walsh and Driscoll were kicking him when a second car drove up. Stewart hoped someone in the second car would help them. However, three people got out of the car hooting and hollering, and one of them, later identified as Walsh and Driscoll's friend Joshua Vieth, joined in hitting and kicking Lecce.

Stewart got out of the pickup with a cellular phone in her hand and said (untruthfully--the phone was out of range) that she had called the police, who were on their way. The two cars and their occupants left the scene.

Lecce was left lying unconscious in a puddle of blood. When he regained consciousness, Stewart drove him to the hospital. He had bumps and bruises all over his head and bruises on his chest. His throat was injured so that he had a hard **time swallowing** and could not talk. Stewart was instructed to wake him every hour that

3

night because of his head injury. He lost one tooth during the assault and another the next day. For several months, he had problems with his balance and suffered from headaches.

Walsh was initially charged with aggravated assault on Lecce. The State later obtained leave to amend the information, adding charges of accountability for aggravated assault on Lecce by Driscoll and Vieth, and assault on Stewart and Chellsi. The jury found Walsh guilty of aggravated assault on Lecce, accountability for aggravated assault by Vieth on Lecce, accountability for assault by Driscoll on Lecce, and assault on Chellsi.

## ISSUE 1

Was sufficient evidence presented at trial to support the charges?

In criminal appeals, this Court reviews the sufficiency of the evidence to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Richards (1995), 274 Mont. 180, 184, 906 P.2d 222, 224.

The State initially points out that Walsh did not move for judgment of acquittal based on insufficiency of the evidence either at the close of the prosecution's case or at the close of all the evidence. He did, however, move for new trial, arguing that the evidence was insufficient to support a finding of serious bodily injury to Lecce or to support the charge of assault on Chellsi.

4

Section 46-16-702(2), MCA, requires that a motion for new trial must be filed within thirty days following a verdict. The State points out that Walsh's motion for new trial was untimely because it was not filed until some fifty-five days after the verdict. While the State is correct that the motion was untimely and should not have been considered, see State v. Gollehon (1995), 274 Mont. 116, 906 P.2d 697, this argument was not raised before the District Court, and therefore we consider it waived.

Accordingly, we will consider whether the evidence was sufficient to support the verdict on the charges of aggravated assault upon Lecce and assault upon Chellsi. However, because Walsh failed to argue at any time prior to filing his brief on appeal that the evidence was insufficient to support the verdict on the accountability charges, we decline to consider that argument. See State v. Johnson (1993), 257 Mont. 157, 162, 848 P.2d 496, 499.

Under § 45-5-202, MCA, a defendant commits aggravated assault if he purposely or knowingly causes serious bodily injury to another. At the time of the offenses charged here, "serious bodily injury" was statutorily defined as bodily injury that:

    (i) creates a substantial risk of death;
    (ii) causes serious permanent disfigurement or protract-
    ed loss or impairment of the function or process of any
    bodily member or organ; or
    (iii)  at the time of the injury, can reasonably be
    expected to result in serious permanent disfigurement or
    protracted loss or impairment of the function or process
    of any bodily member or organ.

Section 45-2-101(59), MCA (1993). As the District Court noted, the trial record in this case is devoid of evidence that Lecce was in substantial risk of death. Therefore, we examine the record for

evidence of serious permanent disfigurement or protracted loss or impairment of the function or process of any bodily member or organ, or reasonable expectation of the same.

Walsh contends that the evidence at trial was not sufficient to sustain his conviction of aggravated assault because Lecce did not suffer serious bodily injury as defined in § 45-2-101(59), MCA (1993). Walsh cites the opinion testimony of Lecce's dentist, Dr. Olson. Dr. Olson testified that although Lecce's loss of two teeth would cause serious or permanent disfigurement and impairment of the function of the teeth in general, the loss of the two teeth could not reasonably have been expected to cause a protracted impairment of the function of the teeth in general. Dr. Olson reasoned that a lot of people get along without all of their teeth.

Dr. Olson further testified that, prior to the beating, Lecce had crowns on teeth numbers eight and nine, but that there were teeth underneath with which he could work. After the beating, the root was exposed on tooth number nine, and Dr. Olson had to perform a root canal and insert a post inside the root large enough to place a crown where the tooth had previously been. He also replaced the crown on tooth number eight.

Walsh has cited no authority indicating that medical testimony is necessary to establish serious bodily injury. A nonexpert witness is competent to testify as to his past or present condition. State v. Bower (1992), 254 Mont. 1, 10, 833 P.2d 1106, 1112. Lecce testified that it took about eight appointments and four months before Dr. Olson was able to insert replacement teeth for

6

him.  He also testified that, since the beating, there were some foods he could no longer eat or could eat only with caution.

We note that several state courts have held that the loss of a tooth was sufficient to support a charge of aggravated assault. See State v. Bridgeforth (Minn. Ct. App. 1984), 357 N.W.2d 393, 394; Lenzy v. State (Tex. Crim. App. 1985), 689 S.W.2d 305, 310.

Further, as did the District Court, we consider the evidence of the injury to Lecce's teeth in conjunction with the evidence of his other injuries.  Walsh and his friends left Lecce lying unconscious in a puddle of blood.  Lecce testified that the aftereffects of the beating included headaches and problems with his balance for several months.  His injuries were potentially serious enough to justify a CAT scan of his head.

Walsh next points to uncertainty in the evidence as to who inflicted the blow that knocked Lecce's teeth loose.  He alludes to the absence of evidence of blood on his footwear or clothing. Lecce testified that he did not recall whether the blow which loosened his teeth occurred before or after the second car arrived. Walsh testified that he hit Lecce only once.  Stewart, in contrast, testified that Lecce was lying on the ground unconscious, with Walsh and Driscoll kicking him, when the second car drove up.

The weight and credibility of the evidence are exclusively within the province of the trier of fact.  State v. Flack (1993), 260 Mont. 181, 189, 860 P.2d 89, 94.  It was the jury's task to determine which testimony was most credible concerning the extent of Walsh's involvement in this incident.

Viewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found the essential elements of the crime of aggravated assault upon Lecce beyond a reasonable doubt.

We next examine the sufficiency of the evidence concerning the charge of assault against Chellsi. Assault is defined in Montana, in relevant part, as purposely or knowingly causing reasonable apprehension of bodily injury in another. Section 45-5-201(1)(d), MCA. Walsh maintains that there was no evidence that he at any time made any move toward the occupants of the pickup. While he concedes that Chellsi's fear may have been real, he contends her fear was not reasonably associated with actions which created an apprehension of impending bodily injury to her.

It is not necessary that the victim of an assault be the direct recipient of the defendant's actions. In State v. Keup (1987), 228 Mont. 194, 741 P.2d 1330, this Court sustained Keup's conviction for assault after he fired a gun at the victim's dog, next to which the victim was standing at the time. Walsh attempts to distinguish this case from Keup, arguing that no shot was fired or move was made in Chellsi's direction. However, it was undisputed that moves were made against Lecce, another occupant of the pickup in which Chellsi was riding.

"The jury may use common experience to conclude that a particular situation would cause a person to experience fear." State v. Lewis (1986), 220 Mont. 418, 422, 715 P.2d 1064, 1067; citing State v. Case (1980), 190 Mont. 450, 621 P.2d 1066.

8

Chellsi, who **was ten years** old **at** the **time** of this incident, testified that she saw Walsh and Driscoll walk over to her mother's pickup and that they were big, were cussing, and appeared to be drunk. Driscoll testified that at the beginning of the confrontation with Lecce, he heard a little girl scream in the pickup. Chellsi testified that she was screaming and frightened because she thought Walsh and Driscoll were going to attack her and her mom, too. She saw Walsh punch Lecce, heard her mother scream at them to stop, and heard Walsh respond "Shut up, bitch."

Viewing the evidence in the light **most** favorable to the prosecution, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Chellsi reasonably apprehended bodily injury to herself, as one of the essential elements of the crime of assault against her.

In summary, we determine that Walsh's **claims** of insufficiency of the evidence are unsupported by the record. We affirm on all grounds raised under this issue.

ISSUE 2

Was prosecutorial misconduct established in the State's amendments to the information?

Walsh was initially charged with aggravated assault on May 25, 1994. Two months later, the State asked for and received permission to file an amended complaint adding the accountability charges. In November 1994, two weeks before trial, the State again obtained leave to amend the information, adding the charges of misdemeanor assault against Stewart and Chellsi.

9

Walsh contends that the amendments were not based upon newly-discovered facts, but were instead filed in response to his refusal to accept a plea agreement. He points out that multiple charges carry with them an inherent prejudice to a defendant. He maintains that no purpose can be shown for the amendment of charges and it should not have been allowed.

"[W]hen the facts of a case support a possible charge of more than one crime, the crime to be charged is a matter of prosecutorial discretion." State v. Booke (1978), 178 Mont. 225, 230, 583 P.2d 405, 408. Section 46-11-205(1), MCA, allows an information to be amended in matters of substance at any time up to five days before **trial.** In this case, the prosecutor complied with all applicable legal requirements in filing the amended information.

Moreover, the record discloses no factual basis for Walsh's assertion that the State improperly amended the **information in** an attempt to coerce him to plead guilty. Prejudice in a criminal case will not be presumed; it must be established by the record that the defendant was denied a substantial right. State v. Arlington (1994), 265 Mont. 127, 150, 875 P.2d 307, 321. We hold that Walsh has not established prosecutorial misconduct in the amendments made to the information.

Affirmed.

_____
Chief Justice

10

We concur:

_____

_____

W. William Leaphart

_____
Justices

11

Justice Terry N. Trieweiler concurring in part and dissenting in part.

I concur with the majority's conclusions that there was sufficient evidence to sustain the defendant's conviction of aggravated assault, and that based on the record available to us, the allegation of prosecutorial misconduct is not established.

I dissent from the majority's conclusion that there was sufficient evidence to sustain the jury's verdict that the defendant assaulted Chellsi Sventgard.

Walsh was involved in one fight with one victim (albeit the odds were unfair and a brutal beating was administered). As a result, he has been convicted of four separate crimes, even though, based on the same facts now known, one charge was originally deemed appropriate. Presumably, based on the majority's conclusions, if more of Walsh's friends had been passing by and stopped to participate in the beating, and if more people had witnessed the beating, Walsh could be charged with an endless number of additional crimes. Applying the same theories applied to Walsh's prosecution, the average hockey player in the NHL would spend the rest of his life behind bars.

Section 45-5-201, MCA, provides, in relevant part, that:

(1) A person commits the offense of assault if he:
. . . .
(d) purposely or knowingly causes reasonable apprehension of bodily injury in another.

There was no evidence that Walsh did anything to purposely or knowingly cause Chellsi to fear that she personally would be injured. She remained in Lecce's vehicle at all times during Lecce's

12

altercation with Walsh. During that time, the doors of the vehicle were locked. At no time did Walsh threaten her. In fact, he said nothing to her. He did not approach the vehicle in a threatening manner; nor did he make any other threatening gesture toward her. Her mother left the vehicle during Lecce's altercation with Walsh, and moved about freely without any threat being made to her physical well-being. In sum, there was no evidence that Walsh either said or did anything which would support a finding that he knowingly or purposely caused Chellsi to fear that she would be personally harmed.

The majority cites various facts in support of its conclusion. However, they all relate to what Chellsi observed Walsh or Driscoll do in relation to some third person. None of the facts demonstrate any aggressive act toward Chellsi, and none of the facts relied on by the majority distinguish her from any other person who witnesses a fight between two other people.

The concurring opinion suggests that this case is distinguishable from a hockey brawl or a barroom fight because of the age of the alleged assault **victim** and the fact that she was returning from a picnic when the alleged assault occurred. Based on the result-oriented approach advocated by the concurring opinion, the amorphous test for assault is simply whether the majority finds the defendant's conduct sufficiently offensive.

The concurring opinion wanders further astray by suggesting that in lieu of any aggressive action toward Chellsi during the defendant's altercation with Lecce. it was sufficient that the

13

state proved defendant tailgated the vehicle in which Chellsi was a passenger with his bright lights on and made obscene gestures at the Lecce vehicle. I am sure the general public will be surprised to learn that tailgating and obscene gestures can serve as the basis for a misdemeanor assault conviction. Furthermore, there is no evidence that Walsh was even aware of Chellsi's presence in the Lecce vehicle while he followed it, much less that by tailgating and gesturing to the vehicle he "purposely or knowingly" caused her fear of bodily injury. Finally, the State's charge of assault was not based on tailgating or gesturing. It was based simply on the fact that Walsh fought with Lecce in Chellsi's presence. The charging document states that:

> On or about the 11th day of May, 1994, in Ravalli County, Montana, the defendant Cory Scott Walsh purposely or knowingly engaged in conduct which placed C. Sv., a youth, in reasonable apprehension of bodily injury by exiting the vehicle which had caused the car in which she was riding to stop and then violently attacking and beating without apparent reason the driver of the car in which she was riding, all in close proximity to C. Sv., which was in violation of the above statute.

While the concurring opinion strikes an admirable blow for chivalry, it is a clear setback for predictable application of the law.

The majority relies on *State v. Keup* (1987), 228 Mont. 194, 741 P.2d 1330. However, there is no similarity between the facts in *Keup* and those in this case. In *Keup*, the defendant actually fired a gun in the direction of the victim. The victim was actually endangered and had reason to fear that she would be injured. Chellsi was not similarly endangered in this case.

Although the number of crimes for which Walsh was convicted based on one fight is not the issue that has been raised, the result in this case presents some bizarre possibilities. Distilled to its essence, the crime that Walsh is guilty of is an unfair fight which resulted in potentially serious injury to his victim.

However, as a consequence of an unfair fight, Walsh has now been convicted of two felonies and two misdemeanors. He was convicted of one felony because of his own participation. He was convicted of a second felony because of another person's participation. He was convicted of a misdemeanor because of a third person's participation. And, he was convicted of a second misdemeanor because of what a witness to the fight observed.

If this case sets any precedent, the opportunities for prosecution of people involved in barroom brawls is endless. For example, if five people beat up one person, each could be charged with five felonies and sentenced to twenty years for each felony conviction. If fifty people witness the beating, each defendant could be charged with fifty counts of misdemeanor assault and sentenced to another six months for each misdemeanor conviction. All sentences could be imposed consecutively, and each participant in the barroom brawl could end up being sentenced to 145 consecutive years for his or her participation.

I doubt very much that there was ever a legislative intention that our criminal statutes be piled on in this fashion. The purpose of misdemeanor assault statutes is to punish people who knowingly harm or threaten harm to someone else.

15

The purpose of accountability statutes is to punish people who, in combination with someone else, cause serious bodily harm when it cannot be determined who actually inflicted the blow that caused the harm.

The inconsistency of the jury's verdict is apparent in this case when analyzed in terms of the only serious bodily harm that was inflicted.

Walsh's conviction for aggravated assault was affirmed on the basis that there was substantial evidence from which a jury could have found that one of his blows knocked out one of Lecce's teeth. However, he was also convicted of accountability for aggravated assault based on blows struck by Joshua Vieth. If the only serious bodily injury that Lecce sustained was the loss of his tooth, how could two separate people on two separate occasions have caused the same serious bodily injury? If both Walsh and Vieth did not cause separate serious bodily injuries, then how could Walsh have been convicted of two felonies? The whole series of developments in this case, beginning with an information which charged only aggravated assault; a subsequent amendment which added accountability for aggravated assault; and a second amendment which added charges of two misdemeanors, when all the information on which the amendments were based was available to the State at the time of the original information, smacks of prosecutorial mischief.

Although our decision is limited to the issues presented to us, the fact that the majority gives its implied stamp of approval to over-charging and over-conviction in this manner by concluding

16

that witnesses to fights **are now** separate **victims, will** assuredly lead to future charges which have more to do with coercing plea agreements than with honestly stating the nature of an accused's alleged criminal conduct.

I am not suggesting that we canonize Walsh, but was it really necessary to convict him of four **crimes** for one beating?

Call me soft, but I have an idea which, if considered and acted upon, would restore some sanity to the criminal justice system. It goes like this. One defendant who administers one beating to one victim who sustains one serious injury is subject to conviction for one felony, punishable by imprisonment for a period of twenty years and a fine of up to $50,000. I know that my idea probably does not satisfy the mob instinct to extract a pound of flesh from Walsh for his abusive and uncivilized conduct; however, it might restore some predictability, rationality, and proportionality to our system of criminal laws. I hope the **majority** will not reject it out of hand.

For these reasons, I dissent from that part of the majority opinion which concludes that there was sufficient evidence to affirm the jury's finding that Cory Scott Walsh assaulted Chellsi Sventgard.

_____
                    Justice

Justice William E. Hunt, Sr., joins in the foregoing concurring and dissenting opinion.

_____
                    Justice

17

Justice W. William Leaphart, specially concurring.


I specially concur with the Court's opinion.   I write in response to the dissent's view that there was insufficient evidence to sustain the jury's verdict that the defendant Walsh assaulted Chellsi Sventgard.

The dissent, in concerning itself with hockey players or barroom denizens, overlooks the fact that in this case we are not talking about someone who attended a sporting event or witnessed a barroom fight.   Rather, the present matter involves a lo-year-old girl who was a passenger in a vehicle with her mother and her mother's fiance Lecce, returning home from a picnic when this assault occurred.

Walsh was convicted of assaulting Chellsi under § 45-5-201, MCA, which provides that a person commits the offense of assault if he "purposely or knowingly causes reasonable apprehension of bodily injury in another."   The dissent contends that there was no evidence that Walsh did anything to purposely or knowingly cause Chellsi to fear that she personally would be injured.   The dissent states :

> At no time did Walsh threaten her.   In fact, he said nothing to her.   He did not approach the vehicle in a threatening manner; nor did he make any other threatening gesture toward her.   Her mother left the vehicle during Lecce's altercation with Walsh, and moved about freely without any threat being made to her physical well-being. In sum, there was no evidence that Walsh either said or did anything which would support a finding that he knowingly or purposely caused Chellsi to fear that she would be personally harmed.

I strongly disagree.   The evidence very clearly indicates that

18

Walsh and his accomplice Driscoll went to great lengths to strike fear into the hearts of *all the occupants* of this vehicle. For starters, the fact that Walsh refused to pass, choosing instead to menacingly tailgate the vehicle for two miles with his bright lights on, would cause both the driver and passengers concern for their safety. The evidence indicates that when Walsh's car did pass, he and Driscoll made obscene gestures at the Lecce vehicle. There is nothing to indicate that Walsh and Driscoll were selective and excluded Chellsi from their threatening gestures. The dissent contends that there is no evidence that Walsh was even aware of Chellsi's presence in the vehicle. If, after tailgating the Lecce vehicle for two miles with lights on high beam, Walsh was unaware that there were three people in the vehicle, it would only be because he could not count. Notwithstanding the dissent's skepticism in this regard, there was no evidence to support such a conclusion.

Walsh then stopped his car directly in front of Lecce's and blocked the roadway. In my view, young Chellsi had, at that point in time, cause to reasonably apprehend bodily injury. That is, when two grown men menacingly tailgate your vehicle for two miles, make obscene gestures at you while passing and then block the roadway, you had best be concerned for your welfare. Their malevolent purpose soon became evident when the two men proceeded to mercilessly beat and kick Lecce. The dissent is correct in noting that neither of them actually made any verbal threats to Chellsi, although they did say "Shut up, bitch" to her mother when

19

she asked them to stop. Then, as if the 2 to 1 odds were not sufficiently favorable, three fresh accomplices arrived on the scene, one of whom joined in hitting and kicking Lecce while the other two stood waiting in reserve. Lecce, who at this point was off his feet, was now confronted with five men. Fortunately we will never know whether these five brave fellows would have turned their attention to Chellsi because Chellsi's mother outwitted them by feigning a call for help on a cellular phone which, unbeknownst to them, was not working.

From Chellsi's 1o-year-old perspective, if Walsh found it sporting to engage in a grossly lopsided assault on Lecce, was it not reasonable for Chellsi to fear that Walsh would find it equally sporting to beat up on one little girl, one on one? In this day and age, whether you are 10 years old or 50, whether male or female, when a group of inebriates stops your car on a rural road at night, after favoring you with obscene gestures, you can assume that they are not going to offer you tickets to a hockey game.

There was more than sufficient evidence to support the verdict that Walsh knowingly and purposely caused Chellsi to reasonably apprehend that she would be personally harmed.


_____
Justice

20

Chief Justice J. A. Turnage and Justice James C. Nelson join in the foregoing specially concurring opinion.

_____
                Chief Justice

_____
                Justice

21